*In re* MARRIAGE OF DOROTHY HOLMAN, Petitioner-Appellee and Cross-Appellant, and JOHN C. HOLMAN, Respondent-Appellant and Cross-Appellee.

Second District   No. 83—206

Opinion filed March 29, 1984.

Melvyn H. Berks, of Berks, Berks & Marcus, Ltd., of Des Plaines, for appellant.

James P. Morgan & Associates, of Hinsdale, and John R. MacKay, of Wheaton, for appellee.

JUSTICE LINDBERG delivered the opinion of the court:

Respondent-appellant-cross-appellee John C. Holman appeals from an order of the circuit court of Du Page County which dissolved his 10-year marriage to petitioner-appellee-cross-appellant Dorothy J. Holman, distributed the parties' marital and nonmarital property and awarded maintenance to Dorothy. John challenges the trial court's award of maintenance and its characterization of certain assets as Dorothy's nonmarital property. Dorothy cross-appeals, raising as error the trial court's allocation of the parties' marital property. We affirm.

Dorothy, age 56 at the time of trial, and John were married on July 4, 1970, in LaGrange, Illinois. Both parties had been married previously; Dorothy had five daughters from her first marriage and John's first marriage produced two sons. Upon the death of her first husband, Dorothy acquired by survivorship a home in LaGrange, Illinois. John and his two sons moved into this residence after the marriage. Dorothy also acquired the beneficial interest in a testamentary trust upon her first husband's death. During their marriage, Dorothy paid the mortgage on the residence from income generated by the trust. The real estate taxes and insurance payments on the residence were paid directly by the trustee, LaGrange State Bank. Dorothy's primary source of income during the years of the parties' marriage was from the trust. John was employed throughout the marriage, owning a variety of businesses which provided his means of support.

On September 25, 1980, Dorothy filed her dissolution petition, and after John filed his answer, the trial court ordered John to pay temporary monthly maintenance of $950, which was later reduced to $700. After hearing testimony for three days, the trial court on November

18, 1982, issued a ruling by letter which divided the parties' nonmarital and marital property and awarded Dorothy permanent maintenance. The letter was subsequently incorporated into a judgment of dissolution. On February 4, 1983, John filed a post-trial motion seeking modification or amendment of the judgment, which the court denied. Thereafter, John filed a timely notice of appeal and Dorothy filed a cross-appeal.

John raises as his first assignment of error that the trial court incorrectly characterized the trust and the LaGrange residence as nonmarital property. While he asserts these designations are erroneous, he does not seek a different allocation of the property. Rather, he requests only that this court redesignate the trust and the house as marital property in the judgment of dissolution. In her cross-appeal, however, Dorothy does challenge the trial court's allocation of the marital property. Since inclusion of the beneficial trust interest and the residence in the marital estate would affect this court's review of the trial court's marital property allocation, we proceed to determine if the court correctly characterized the trust and residence as nonmarital property.

Section 503(a) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat., 1982 Supp., ch. 40, par. 503(a)) (IMDMA) designates property acquired by certain means as nonmarital. The trial court in section 503 is directed to "assign each spouse's non-marital property to that spouse." (Ill. Rev. Stat., 1982 Supp., ch. 40, par. 503(d).) The statute then directs the court to apportion the marital property in just proportions considering as one factor the value of the nonmarital property set apart to each spouse. Ill. Rev. Stat., 1982 Supp., ch. 40, par. 503(d)(2).

The trust which is the subject of this appeal was established in 1966 by Dorothy's first husband. The trust beneficiaries are Dorothy and her five daughters. The trust agreement established two funds: the marital fund (Trust A) and the residual fund (Trust B). Dorothy was entitled to all of the income and up to $5,000 in principal from Trust A and by 1977, the marital fund was exhausted. Dorothy is entitled to the income from Trust B and may receive distribution of the principal if the trustee, LaGrange State Bank, determines the sums are necessary for her reasonable support and comfort. Judith French, a trust administrator at the bank, testified that Dorothy is required to make an application for principal distribution and the decision whether to grant the application is within the discretion of the trustee bank. French stated preservation of the trust corpus for the remaindermen was one factor to be considered in deciding upon a request to

distribute principal.

Neither party disputes that the trust was Dorothy's nonmarital property at the beginning of the marriage. John contends, however, that the trust was transmuted into marital property based on two theories. First, John contends he enhanced the value of the trust by paying the State and Federal taxes due on the income produced from the trust. John argues that had the trust been required to pay the taxes, at least the interest and perhaps some of the principal from the trust would have been expended. Dorothy responds that she paid the taxes on the trust income in 1973 and 1975, and furthermore, that John's payment of the parties' State and Federal income tax liability did not increase the value of the trust corpus.

▪ We conclude that John's payment of the parties' income tax liability is insufficient to effect a transmutation. John does not cite any decision which has addressed his transmutation theory. Supportive of Dorothy's theory is *In re Marriage of Jones* (1982), 104 Ill. App. 3d 490, 432 N.E.2d 1113. There, the husband entered the marriage with a stock trust. During the marriage, he reinvested most of the dividends in additional stocks, kept the trust assets segregated from the parties' marital property, and reported the income earned by the stock trust on their joint tax returns. In defense of the trial court's characterization of the trust as nonmarital, the husband argued that "the payment of taxes does not constitute the preservation or enhancement of the stock trust." (104 Ill. App. 3d 490, 497; 432 N.E.2d 1113, 1118.) On appeal, the court agreed that the trust was nonmarital. The court found significant that the husband segregated the trust from marital funds, reinvested most of the dividends, and did not commingle the trust income with marital property. As in *Jones*, the parties here reported the trust income on their joint income tax returns. The trust was always segregated from the parties marital property, and the trust income was used almost exclusively to make the mortgage, insurance and property tax payments on the LaGrange residence. We find *Jones* persuasive and conclude that John's payment of the income tax liability on the income from the trust did not transmute the trust corpus into marital property. See also *In re Marriage of Wojcicki* (1982), 109 Ill. App. 3d 569, 440 N.E.2d 1028 (property retained its nonmarital·character even though marital funds were used to pay real estate taxes on the property).

As his second transmutation theory, John contends the commingling of trust income with trust principal transformed the trust into marital property. John's argument is unpersuasive. The record demonstrates the trust income was not commingled with trust principal.

Trust administrator French testified that in certain years, when not all of the trust income was distributed to Dorothy, the accumulated income was deposited into an account separate from that containing the principal cash because the latter was used for investment. Since the funds were not commingled, John's transmutation argument is without merit.

John next contends the trial court erroneously concluded that the LaGrange house was Dorothy's nonmarital property. After John and Dorothy were married, Dorothy maintained the house in her name alone until she transferred the title to the LaGrange State Bank in trust on February 13, 1976, retaining the sole beneficial interest and naming her five daughters as remaindermen. Dorothy testified that on February 14, 1970, the parties had a discussion in which Dorothy agreed to pay the monthly expenses on the home including the mortgage, real estate taxes, and the insurance payments. In return for these payments, Dorothy stated, John agreed to pay the utilities on the house and the parties' grocery bills. In his testimony, John confirmed that this understanding existed between the parties. Although the parties dispute who paid for certain maintenance expenses on the residence, the terms of their agreement were adhered to by the parties. Dorothy testified that the trust department of the bank would deposit $450 monthly into a checking account at the LaGrange State Bank held jointly by John and Dorothy. The bank then would automatically withdraw from the account the funds necessary to pay the mortgage. John testified that he never contributed any funds to the LaGrange State Bank checking account which he regarded as her account. He also stated he never contributed any funds toward the mortgage, real estate taxes or insurance on the residence. Similarly, Dorothy testified she never contributed any funds to this account and the only funds ever deposited there were from her trust. John testified that he paid the utilities and grocery bills from his Edgewater Bank account which both John and Dorothy testified was his account. Dorothy never made a withdrawal from or deposit to this account during their marriage.

John argues, however, that the simple fact that the trust income was placed in a marital account which was then used to pay the mortgage on the LaGrange home transmuted the residence into marital property. Transmutation can occur when nonmarital property is commingled with marital property, thereby converting the entire nonmarital property into marital property. The supreme court has specifically recognized the transmutation-of-property theory. (*In re Marriage of Smith* (1981), 86 Ill. 2d 518.) In *Smith*, the court stated "where a

spouse who holds nonmarital property causes it to be commingled with marital property, or with nonmarital property of the other, we hold that the commingled property is presumed to be marital property." 86 Ill. 2d 518, 529.

■ Dorothy persuasively asserts, however, that the evidence rebutted any presumption that the house was marital property. The record establishes that the trust income was nonmarital. (See *In re Marriage of Jones* (1982), 104 Ill. App. 3d 490, 432 N.E.2d 1113; but see *In re Marriage of Reed* (1981), 100 Ill. App. 3d 873, 427 N.E.2d 282 (interest earned during the marriage on nonmarital certificate of deposit is marital property).) This income was deposited by the trustee bank monthly into the checking account in both parties' names. That fact raises the presumption that the account was marital property. (See *In re Marriage of Emken* (1981), 86 Ill. 2d 164.) The uncontradicted testimony of both John and Dorothy, however, rebuts the marital presumption. Dorothy and John testified concerning their agreement regarding which expenses each party would assume in connection with the LaGrange residence. Dorothy testified she told John prior to the marriage that she wanted to continue paying the mortgage, insurance premiums and real estate taxes. Dorothy's expressed intention to maintain the residence as her separate property was evidenced by her placing in trust the title to the LaGrange residence with her daughters as beneficiaries. Consistent with the parties' agreement, Dorothy made these payments out of the LaGrange checking account or had the bank pay the creditors directly. John testified that he never made a withdrawal from or a deposit to this account, and Dorothy testified that she never deposited any funds in this account. The only deposits were made directly by the LaGrange State Bank. This testimony rebuts the presumption of marital property raised because the account was in the names of both parties.

John unpersuasively contends that this court cannot consider whether the LaGrange checking account was characterized incorrectly as marital property by the trial court because Dorothy failed to challenge the characterization in her notice of appeal. In his notice of appeal, John challenged "the Court's findings and orders entered on the same day relative to the designation and assignment of non-marital and marital property owned by the parties." This broad language empowers this court to consider all decisions of the trial court relative to the characterization of the marital and nonmarital property. John raises in his appellate brief the trial court's characterization of the trust and residence as nonmarital property. The interrelationship of the LaGrange checking account with these two assets necessarily re-

quires this court to consider whether the account was marital or nonmarital and thus, that issue is properly before this court.

■■ ■ Since the funds used to reduce the mortgage obligation were nonmarital and the account from which the mortgage was paid also was nonmarital, the trial court properly characterized the LaGrange residence as Dorothy's nonmarital property. Transmutation can occur when a party expends marital funds to preserve or repair a nonmarital asset. (*In re Marriage of Olson* (1983), 96 Ill. 2d 432.) The trust income was nonmarital, and thus the residence maintained its nonmarital character when the bank applied the trust income to reduce the mortgage obligation. Even if a marital presumption were to be raised concerning the residence, such a presumption would be rebutted based upon the evidence in the record. Dorothy's intention to maintain the house as her nonmarital property is evidenced by her retention of the title to the property in her name alone after the marriage and her transfer of title to the LaGrange State Bank as trustee with only herself and her daughters as beneficiaries. Dorothy's insistence on paying the mortgage, insurance and taxes on the property from her trust income alone further indicates that Dorothy from the inception of the marriage intended to retain the house as her separate property. The totality of this evidence convinces us that Dorothy rebutted any marital presumption concerning the LaGrange residence.

John raises as an additional argument that his contributions to and improvements on the house transmuted the character of the property. In support of his theory, John refers to his testimony wherein he stated he remodeled the side porch, replaced the deck, the stairs and the pillar supports, replaced all of the front porch screens, repainted the outside and inside of the house, replaced window panes and sash cords, tarred and sealed the balcony of the den, put in a new front and back yard lawn and installed a new water heater. John stated he bought the materials with marital funds and received no funds from Dorothy. John also testified he purchased a dishwasher, stove and refrigerator for the residence. In contrast, Dorothy testified she bought the materials when John repainted the deck, stairs and support beams in 1975. Dorothy stated she paid for the materials used in repairing the screens, the windows and the balcony den and purchased most of the paint used for the inside and outside of the house. She further testified that John only painted the outside of the house once during the marriage.

John relies on *In re Marriage of Lee* (1981), 87 Ill. 2d 64, for the proposition that repairs paid out of marital funds on a home previously owned as nonmarital property by one spouse creates the rebutt-

able presumption that the property is marital. In *Lee*, the husband entered the marriage with a house valued at $12,500. During the parties' five-year marriage, they expended $20,000 for improvements on the house; $20,000 from marital funds and $8,000 loaned from a bank. The trial court valued the home at $32,500 (the value of the home prior to the marriage plus the $20,000 in improvements) and ruled that the $12,500 acquisition price was the husband's nonmarital property. The appellate court disagreed, concluding the entire value of the property became transmuted because of the use of marital funds to pay the mortgage. In affirming the appellate court, the supreme court in *Lee* emphasized that the increase in value of the house was attributable in part to the wife's employment earnings and household duties. These facts compelled the court to conclude that the contribution of marital funds created the rebuttable presumption, unrebutted by the husband, that the entire residence was transmuted into marital property. Unlike *Lee*, the facts here do not create a rebuttable presumption that the house is marital property. John introduced no evidence of the value of the repairs or the amount he expended for repairs and materials. Furthermore, while not expressly relied on by the supreme court in *Lee*, the improvements there constituted almost two-thirds of the total value of the house. Here, even if we were to have evidence of value, the improvements would not, we believe, amount to a significant percentage of the $108,000 net value of the LaGrange residence.

The supreme court's recent decision in *In re Marriage of Olson* (1983), 96 Ill. 2d 432, also supports the conclusion that a transmutation of the LaGrange home did not occur. Prior to her marriage, the wife in *Olson* owned the residence with her parents in a land trust. During the marriage, the couple extensively remodeled the house. The husband, who was in the construction business, did a "substantial amount of this work" and his subcontractors donated their services. In the marriage's early years, the husband deposited his paycheck into a joint checking account from which the mortgage payments were made. In concluding that the home retained its nonmarital character, the *Olson* court, as noted by John here, did not determine that the husband's improvements were insufficient to raise a presumption of marital property. Rather, the court held only that the wife's evidence rebutted any presumption which might have arisen. Nevertheless, langauge in *Olson* directly addresses John's transmutation argument:

> "Every act of commingling or every use of marital funds for the maintenance of nonmarital property, however, should not

work a transmutation. Such a strict reading of our holding in *Smith* would practically render the concept of nonmarital property illusory. The commingling of marital and nonmarital assets, and the contribution of marital assets to nonmarital property must be sufficiently significant to raise a presumption of a gift of the property to the marital estate. Thus, the making of or paying for repairs and maintenance on the house that do not materially add to its value or payments that do not reduce the indebtedness of the mortgage should not raise the presumption of transmutation." (96 Ill. 2d 432, 440.)

Here, John did not establish that his repairs materially added to the value of the house and thus, his evidence of repairs is insufficient to raise the rebuttable marital property presumption.

Even were a presumption to arise, Dorothy's evidence here rebutted any presumption that the house was marital property. The *Olson* court found as persuasive rebuttal evidence the following facts:

"Geraldine's refusal to place the house in joint tenancy with her husband, her insistence that the house belonged to her parents, and the continuation of the title to her beneficial interest in her name completely rebuts any presumption that she intended to make a gift of the house or her interest in it to the marital estate." (96 Ill. 2d 432, 441.)

Likewise, here Dorothy maintained the home in her name alone, and eventually authorized the bank as trustee to hold title for the benefit of herself and her daughters. These facts rebut any marital property presumption.

■ The next issue is Dorothy's assertion in her cross-appeal that the trial court erred in apportioning the marital property. Dorothy argues that John was awarded 92% and that she was awarded only 8% of the marital property. Dorothy emphasizes she made significant contributions to the marriage as homemaker which freed John to focus all of his efforts toward his business endeavors. (See Ill. Rev. Stat., 1982 Supp., ch. 40, par. 503(d)(1).) Dorothy highlights her station in life; her bad health, her advanced age, her absence from the work force, and her high expenses as factors militating against awarding all of the marital property to John. In contrast, she asserts, John is in good health, has maintained gainful employment throughout the marriage, and earns income substantially in excess of his living expenses. On the basis of the statutory factors, Dorothy contends the property was not distributed in just proportions.

Section 503 of the IMDMA requires that marital property be distributed in just proportions. (Ill. Rev. Stat. 1981, ch. 40, par. 503.)

The statute requires the trial court to first determine if any of the property is nonmarital and then to award that property to the proper spouse. In apportioning the marital property, the court is directed specifically to consider the "value of the property set apart to each spouse." (Ill. Rev. Stat., 1982 Supp., ch. 40, par. 503(d)(2).) This factor is especially significant in this case. Dorothy received as nonmarital property a residence with a net value of $108,000 and her beneficial interest in a trust with a market value of $116,000. In contrast, John received only $14,040 in nonmarital property. Dorothy's significant amount of nonmarital property justified an award of most of the marital property to John. See *Atkinson v. Atkinson* (1981), 87 Ill. 2d 174, *cert. denied* (1982), 456 U.S. 905, 72 L. Ed. 2d 162, 102 S. Ct. 1751.

Examination of the marital property buttresses the conclusion that the trial court's award was in just proportions. Of the $121,455 in total marital property, $85,000 or 70% is represented by John's business, The Big Gallon, a gas station and food store in Cicero, Illinois. The source of the funds for the business can be traced in large part to property and assets owned by John before the marriage. In 1969, prior to the parties' marriage, John sold a home for a $15,000 profit and invested $5,000 of that amount in a milk business partnership, placing the remaining $10,000 in a Cicero, Illinois, bank account. After the marriage, John sold his interest in the first partnership, established another partnership with his cousin and later sold his interest in the second partnership for approximately $30,000. John invested some of these funds in a new business, and then he withdrew the funds from that venture and invested in The Big Gallon. From December 1977 through October 1978, John rented the property on which he operated this business. Thereafter, he received a loan for $46,000 from the LaGrange State Bank. He also invested in his business $38,000 of his own funds accumulated from the sales of his nonmarital house and his previous businesses. At the time of trial, John testified the mortgage balance on the property had been reduced to $21,000. The only evidence of Dorothy's contribution to the business was that she worked part-time for approximately one year as a clerk in the food store prior to the time John purchased the property. While neither party disputes that The Big Gallon is marital property because John's salary was used to reduce the mortgage balance, the record makes clear that John's efforts and funds were responsible for the creation and continuation of the business. (See Ill. Rev. Stat., 1982 Supp., ch. 40, par. 503(d)(1).) The business is also John's means of income. We conclude the trial court properly awarded the entire business to John.

■ The remaining marital property is valued at $36,455 of which only $4,400 is income-producing. Since Dorothy was awarded a significant amount of nonmarital property, the trial court awarded John most of the marital property including much of the parties' vacant land which is relatively illiquid. Recognizing that Dorothy's income was inadequate to meet her reasonable needs, however, the court required John to pay permanent monthly maintenance of $625. While the IMDMA encourages a trial court to provide for a spouse's reasonable needs through its distribution of marital property rather than through an award of maintenance (*In re Marriage of Sevon* (1983), 117 Ill. App. 3d 313, 453 N.E.2d 866), given the nature of the marital assets and the income needs of the parties, we conclude the award was in just proportions.

Our supreme court affirmed an award of almost all of the marital property to one spouse in *Atkinson v. Atkinson* (1981), 87 Ill. 2d 174, *cert. denied* (1982), 456 U.S. 905, 72 L. Ed. 2d 162, 102 S. Ct. 1751. There, the husband owned more than $500,000 in nonmarital assets which produced annual dividend income of $27,800. Apart from the husband's Individual Retirement Account, the only marital asset was the marital home. Specifically relying on the facts that the husband had substantial nonmarital assets and income from those assets, the appellate court upheld the award of the marital home to the wife. Like the husband in *Atkinson,* Dorothy here has substantial assets, one of which generates $10,000 in annual income. However, *Atkinson* is dissimilar to the facts in the case at bar in that in *Atkinson,* the court found that the husband had a greater opportunity for future acquisition of capital assets and income. Here, John would appear to be better able to acquire future assets based upon his business. Nevertheless, the principal factor motivating the award of most of the assets to one spouse in *Atkinson* was the substantial amount of nonmarital assets of the other spouse, and thus, *Atkinson* supports the trial court's allocation of property in the case at bar.

■ An award of nearly all of the marital property to one spouse was also discussed in *In re Marriage of Hapaniewski* (1982), 107 Ill. App. 3d 848, 438 N.E.2d 466. There, the trial court had awarded the two parcels of marital real estate which had an equity value of approximately $50,000 to the wife. The parties had no other marital assets of consequence. While reversing and remanding the property award because the husband's nonmarital assets had not been valued, the appellate court in *Hapaniewski* expressly stated that the award of the marital property to one spouse was not necessarily unjust.

"We do not mean to intimate, however, that the marital prop-

erties of the parties could never be awarded in their entirety to the petitioner. There is no requirement in Illinois that marital property be divided equally [citation], and it is possible for one party to receive all of the marital assets as his or her 'just proportion' [citation]." (107 Ill. App. 3d 848, 854, 438 N.E.2d 466, 470.)

See also *In re Marriage of Sevon* (1983), 117 Ill. App. 3d 313, 453 N.E.2d 866 (award to wife of home valued at $133,500, car and her pension in lieu of maintenance was in just proportions even though husband only received his automobile and a small insurance policy); *In re Marriage of Schriner* (1980), 88 Ill. App. 3d 380, 410 N.E.2d 572 (significant amount of nonmarital property of husband justified award of substantially all of marital property to wife). We conclude the trial court's allocation of the marital property was not an abuse of discretion.

John's final contention is the trial court erred in requiring him to pay Dorothy $625 in permanent monthly maintenance. Section 504 of the IMDMA authorizes a trial court to award maintenance only if it finds that the spouse seeking maintenance:

"(1) lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs, and,

(2) is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home, or,

(3) is otherwise without sufficient income." (Ill. Rev. Stat., 1982 Supp., ch. 40, par. 504.)

As with the court's decision whether to award maintenance, the amount of the maintenance award lies within the discretion of the trial court and its decision will not be set aside unless contrary to the manifest weight of the evidence or amounting to an abuse of discretion. *In re Marriage of Johnson* (1982), 106 Ill. App. 3d 502, 436 N.E.2d 228.

John argues the maintenance award was an abuse of discretion because Dorothy's nonmarital property is sufficient to provide for her reasonable needs. Specifically, John contends the terms of the trust obligate the trustee to distribute principal necessary for her reasonable support and comfort. Because of the significant amount of nonmarital property possessed by Dorothy, John argues the trial court erred in concluding that she lacked sufficient property including marital property apportioned to her to provide for her reasonable needs.

Subsection (a)(1) of section 504 employs the term "reasonable

needs" of a spouse seeking maintenance as a benchmark for determining the sufficiency of the property of the spouse seeking maintenance, and a party's reasonable needs are determined in light of his or her overall circumstances including the standard of living during the marriage. (Ill. Ann. Stat., ch. 40, par. 504, Supp. to Hist. & Prac. Notes, at 83 (Smith-Hurd Supp. 1983); *In re Marriage of Simmons* (1980), 87 Ill. App. 3d 651, 409 N.E.2d 321.) A spouse need not sell assets nor impair capital to provide for his support. (*In re Marriage of Thornton* (1980), 89 Ill. App. 3d 1078, 412 N.E.2d 1336.) Dorothy adequately demonstrated that she did not have unlimited access to the principal of the trust and further demonstrated that her annual income from the trust is insufficient to meet her annual expenses. Even with her trust income, her standard of living will decrease significantly without an award of maintenance. Therefore, she has established her entitlement to maintenance.

Two of the factors to be considered by a court in determining the amount of maintenance are the financial resources of a spouse seeking maintenance and the ability of the spouse from whom maintenance is sought to meet his reasonable needs as well as his maintenance obligation. (Ill. Rev. Stat., 1982 Supp., ch. 40, pars. 504(d), 405(b)(6).) Dorothy filed an affidavit listing her monthly expenses at $1,574.81. The trust in 1981 earned $10,705 or $892 monthly. She also receives $130 monthly from her mother who lives with her. We recognize that Dorothy's mortgage obligation will terminate within a short period of time, but even without a mortgage payment, Dorothy's expenses will exceed her income. Additionally, the marital property awarded her is nonincome-producing except for a small amount of stock and a one-half interest in a savings account.

The record indicates John is able to make the maintenance payment and still meet his needs. In 1981, the only year for which we have clear and specific evidence, John's net business income was $34,770. After adding back depreciation of $9,351 in interest and dividends of $321, John's income for 1981 was approximately $44,442. By affidavit, John stated his monthly living expenses totaled $2,207.75. While he stated his income had declined substantially since 1981, John offered insufficient evidence of the amount of his income reduction. John testified only that his income had declined 20% during the first three months of 1982 because he was selling fewer gallons of gasoline than during the same period in 1981. Additionally, John cites no case where the appellate court reversed an order of the trial court awarding maintenance. John relies upon *In re Marriage of Emken* (1980), 89 Ill. App. 3d 667, 411 N.E.2d 599, *aff'd in part, rev'd in part*

*and remanded on other grounds* (1981), 86 Ill. 2d 164, as most directly analogous to the case at bar. In *Emken,* both parties had been married previously, and each owned a nonmarital farm. After awarding each party his or her respective farm, the trial court denied the wife's request for maintenance, in part because she was only supporting herself and was employed. These facts distinguish *Emken* from the instant case. Here, Dorothy worked only for a brief period as a clerk in John's business and has no employment skills. Additionally, both her 92-year-old mother and disabled daughter live with her. Finally, in *Emken* the appellate court affirmed a denial of maintenance, and did not reverse an order granting maintenance; the latter being the relief sought by John here. While we affirm the maintenance award, we note that should either party's circumstances change, he or she can petition the trial court to modify the maintenance obligation. See Ill. Rev. Stat. 1981, ch. 40, par. 510.

Accordingly, we affirm the judgment of the circuit court of Du Page County.

Affirmed.

SEIDENFELD, P.J., and VAN DEUSEN, J., concur.